HAWKEYE-SECURITY INSURANCE COMPANY v VECTOR
CONSTRUCTION COMPANY

Docket No. 109074. Submitted April 3, 1990, at Lansing. Decided
September 11, 1990.

Vector Construction Company entered into a contract with Bar-
ton-Malow Company, general contractor on a project to make
certain improvements on a waste water treatment plant, to
provide all labor, materials and equipment necessary to per-
form the concrete work on the project. Vector then contracted
with Boichot Concrete Company to have Boichot supply con-
crete meeting certain project specifications. Boichot delivered
concrete to Vector, which used it on the waste water treatment
project. It was later determined that the concrete delivered by
Boichot failed to meet specifications and Vector was forced to
remove and repour 13,000 yards of concrete. Vector commenced
an action against Boichot, alleging breach of contract, breach of
warranty and negligence. Barton-Malow commenced an action
against Vector for breach of contract and against Boichot for
breach of contract, breach of warranty and negligence. Vector,
in addition to filing suit against Boichot, filed a claim with
Hawkeye-Security Insurance Company, its insurer under a
policy which provided for comprehensive general liability cover-
age for all damages arising from bodily injury or property
damage "caused by an occurrence." Hawkeye denied the claim
and commenced a declaratory judgment action in Clinton Cir-
cuit Court. Venue was changed to Ingham Circuit Court on
Vector's motion. Hawkeye moved for summary disposition. The
trial court, James T. Kallman, J., granted the motion, finding
that the insurance policy was not intended to cover damages
arising out of the correction of defects resulting from the
insured's failure to deliver goods and services free from defec-
tive workmanship. Vector appealed.

The Court of Appeals *held:*

REFERENCES

Am Jur 2d, Insurance §§ 269 *et seq.*; 703 *et seq.*

Liability insurance: "accident" or "accidental" as including loss
resulting from ordinary negligence of insured or his agent. 7
ALR3d 1262.

1. The insurance policy defines an "occurrence" as an "accident." The comprehensive general liability coverage for property damage was not intended and does not extend to damages arising out of the correction of work which had been done with defective workmanship even where the defective workmanship is the result of the negligence of a supplier. The trial court properly found that there had not been an occurrence within the meaning of the policy and, accordingly, that there was no insurance coverage.

2. The general exclusion in the body of the policy providing that insurance did not apply to property damage to the insured's products was not superseded by any of the special endorsements to the policy.

3. The exception to an exclusion does not grant coverage but rather merely prohibits application of the exclusion under the designated circumstances. Accordingly, since an exception to an exclusion cannot grant coverage, there cannot be the claimed ambiguity between the claimed coverage granted by an exception to one exclusion and other listed exclusions.

Affirmed.

1. INSURANCE — LIABILITY INSURANCE — OCCURRENCE — DEFECTIVE WORKMANSHIP.

An insurance policy obligating the insurer to pay all sums the insured becomes legally obligated to pay as damages arising from bodily injury or property damage caused by an occurrence, where an occurrence is defined in the policy as an accident, does not obligate the insurer to pay such damages for which the insured may become liable to correct a situation resulting from the insured's supplying of a product which is unacceptable because it suffers from defective workmanship, since, even if the defective workmanship is the result of the negligent failure of another to supply the insured with proper materials, there is not an occurrence within the meaning of the insurance policy.

2. INSURANCE — EXCLUSIONS.

Exclusions in insurance contracts are to be read with the insuring agreement independently of every other exclusion.

*Howard & Howard Attorneys, P.C.* (by *James E. Lozier* and *Mark H. Canady*), for plaintiff.

*Abood, Abood & Rheaume, P.C.* (by *William E. Rheaume*), for defendant.

Before: WAHLS, P.J., and MARILYN KELLY and
G. S. ALLEN,* JJ.

G. S. ALLEN, J. In this declaratory judgment
action, which raises a question of first impression
in Michigan, we are asked to set aside the trial
court's grant of summary disposition in favor of
plaintiff, Hawkeye-Security Insurance Company,
and to conclude that Hawkeye possesses a duty to
defend or indemnify defendant, Vector Construc-
tion Company, under the terms of a contract of
insurance entered into between the parties. We
cannot do that which is asked of us.

I

The material facts are not in dispute. Barton-
Malow Company, a general contractor in the con-
struction field, entered into a subcontract with
Vector, a concrete contractor, on April 5, 1984,
pursuant to which Vector agreed to provide all
labor, materials and equipment necessary to per-
form all of the concrete work involved in certain
improvements to be made at the Delta Township
waste water treatment plant. Vector then con-
tracted with Boichot Concrete Company to provide
Vector with concrete meeting certain project speci-
fications. Boichot delivered the concrete to Vector
during July, August, and September, 1985. Vector
used this concrete to construct the roof of the grit
building at the plant. The concrete was also used
to construct other improvements to the plant.
After the concrete had been poured, testing re-
vealed that the concrete failed to comply with
project specifications. Consequently, Delta Town-
ship, owner of the plant, demanded corrective

* Former Court of Appeals judge, sitting on the Court of Appeals by
assignment.

measures be taken. Vector removed and repoured 13,000 yards of concrete.

Subsequently, Vector filed suit against Boichot, alleging breach of contract, breach of express and implied warranties, and negligence. Barton-Malow filed suit against Vector alleging breach of contract, and against Boichot, alleging negligence, breach of express and implied warranties, and breach of contract under a third-party beneficiary theory.

Vector, in addition to filing suit against Boichot, notified Hawkeye, its insurance carrier, of the incident and filed a claim with Hawkeye. Hawkeye denied coverage and filed a complaint for declaratory relief on February 13, 1987, in Clinton Circuit Court. On Vector's motion venue was changed to Ingham Circuit Court.

Hawkeye moved for summary disposition under MCR 2.116(C)(10) on April 6, 1988. By opinion and order dated April 22, 1988, the court granted Hawkeye's motion, finding in part:

> Said policy, when read as a whole, is unequivocal in that it does not provide coverage for property damage to work product due to faulty workmanship. The defect in the concrete supplied to Respondent by its supplier does not constitute an "occurrence" as defined in the policy. Further, the exclusions under the broad form comprehensive general liability policy endorsement excludes [sic] coverage for the restoration, repair or replacement of property, not on the premises of the insured, which has been made or is necessary by reason of faulty workmanship by or on behalf of the insured.

Vector's motion for reconsideration was denied on May 16, 1988. Vector now appeals as of right.

II

A trial court may summarily dispose of a claim

where, except as to the amount of damages, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10). Before the court may summarily dispose of a claim under this court rule, the court must determine whether a record might be developed which might leave open an issue upon which reasonable minds could differ, giving the benefit of reasonable doubt to the non-movant. *Dumas v Automobile Club Ins Ass'n,* 168 Mich App 619, 626; 425 NW2d 480 (1988). All inferences are to be drawn in favor of the nonmovant. *Dagen v Hastings Mutual Ins Co,* 166 Mich App 225, 229; 420 NW2d 111 (1987), lv den 430 Mich 887 (1988). Before judgment may be granted, the court must be satisfied that it is impossible for the claim asserted to be supported by evidence at trial. *Peterfish v Frantz,* 168 Mich App 43, 48-49; 424 NW2d 25 (1988).

III

Vector secured from Hawkeye the insurance policy in question. This policy contains two sections, one defining the parameters of property coverage and a second defining the parameters of comprehensive general liability coverage. The latter includes coverage for all sums which Vector becomes legally obligated to pay as damages arising from bodily injury or property damage "caused by an occurrence." The insurance contract defines "occurrence" as follows:

> "[O]ccurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured . . . .

The contract does not define the term "accident."

In *Frankenmuth Mutual Ins Co v Kompus,* 135 Mich App 667, 678; 354 NW2d 303 (1984), lv den 421 Mich 863 (1985), a panel of this Court, being called upon to define the term "accident" as contained in an insurance contract definition of "occurrence" which is substantially similar to the definition quoted in the preceding paragraph, adopted the following definition:

> " 'An "accident," within the meaning of policies of accident insurance, may be anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.' " *Guerdon Industries, Inc v Fidelity & Casualty Co of New York,* 371 Mich 12, 18-19; 123 NW2d 143 (1963), quoting 10 Couch on Insurance (2d ed), § 41:6, p 27.

Vector argues that its defective workmanship, e.g., use of inferior concrete supplied to it by Boichot, gave rise to causes of action against Boichot sounding in negligence and breach of warranty and that misdeeds that give rise to such causes of action have been held by courts in other jurisdictions to constitute "accidents" for purposes of establishing "occurrences" within the meaning of similarly worded insurance contracts. Whether Vector's alleged defective workmanship constitutes an accident/occurrence within the meaning of the insurance contract is a question of first impression in Michigan.

Vector relies on *Bundy Tubing Co v Royal Indemnity Co,* 298 F2d 151 (CA 6, 1962), in support of its argument. In that case, Bundy manufactured thin-walled steel tubing which building contractors and plumbers installed in concrete floors for use in radiant heating systems. *Id.* Some of the tubing manufactured by Bundy contained defects that caused the tubing to fail and leak. Several parties then sued Bundy to recover damages to property sustained by reason of the defective tubing. The suits alleged negligence in the manufacture of the tubing or breach of warranty or both. Royal, Bundy's insurer, defended three of eight suits filed against Bundy. They refused to defend the remaining five suits. Thereafter, Bundy sued Royal seeking to recover the amounts paid out in satisfaction of a judgment rendered against it, in settlement of claims, and in costs and expenses incurred in defending the five suits Royal refused to defend. *Id.* at 151-152.

At issue in Bundy's suit against Royal was the extent of liability coverage offered in two policies of liability insurance that Royal had issued to Bundy. Both policies contained identical provisions which provided that Royal would pay all sums which Bundy became legally obligated to pay as damages arising from "injury to or destruction of property, including the loss of use thereof, *caused by accident.*" *Id.* at 152. (Emphasis added.) Additionally, both policies contained a clause excluding coverage for "injury to or destruction of . . . any goods or products manufactured, sold, handled or distributed [by Bundy] . . . out of which the accident arises." *Id.*

The district court held that no duty to defend or indemnify arose under the provisions of the insurance contracts as each of the suits filed against Bundy involved claims of breach of warranties or

of negligence and, therefore, the damages were not caused by accident. *Id.*

The United States Court of Appeals for the Sixth Circuit disagreed with the district court's finding that no property was damaged as a result of an accident:

> In our opinion, property was damaged by the installation of defective tubing in a radiant heating system which caused the system to fail and become useless. A homeowner would never have such equipment installed if he knew that it would last only a very short time. A home with a heating system which did not function would certainly not be suitable for living quarters in the wintertime. The market for its sale would be seriously affected.
>
> The failure of the tubing in the heating system in a relatively short time was unforeseen, unexpected and unintended. Damage to the property was therefore caused by accident. [*Id.* at 153.]

The court also disagreed with the district court's conclusions as to the effect the nature of the claims asserted against Bundy had on the scope of coverage.

> The fact that the claims here involved breach of warranty or negligence did not remove them from the category of accident. Bundy would not be legally obligated to pay a claim arising out of an accident occurring without its negligence or breach of warranty. If the liability policy were construed so as to cover only accidents not involving breach of warranty or negligence, then no protection would be given to the insured. The insured would not need liability insurance which did not cover the only claims for which it could be held liable. The word "accident" is common in most liability policies and should not be construed in this type of case as not including claims involving negligence or breach of warranty. [*Id.*]

The court then concluded that the exclusionary clauses contained in each of the insurance contracts eliminated recovery "for the value of the defective tubing or the cost of new tubing to replace it." *Id.* However, because the failure of the tubing constituted an accident which damaged the property of others, Royal was obligated to indemnify Bundy for sums arising out of damage done to the property, including "[t]he cost of removing defective tubing and the cost of installing new tubing." *Id.* at 154.

We find Vector's reliance on *Bundy* misplaced. *Bundy* stands for nothing more than the proposition that an insurer must defend and may become obligated to indemnify an insured under a general liability policy of insurance that covers losses caused by "accidents" where the insured's faulty work product damages the property of others. In the instant case Vector seeks what amounts to recovery for damages done to its own work product, and not damage done to the property of someone other than the insured. Instead, we find the case of *McAllister v Peerless Ins Co,* 124 NH 676; 474 A2d 1033 (1984), to be more instructive.

In *McAllister,* the plaintiff operated a landscape and excavation business. In 1979, a gentleman named Finkelstein hired McAllister to landscape his property and to construct a leach field on it. In 1980, Finkelstein sued McAllister for breach of contract, alleging faulty workmanship in constructing the leach field and in performing the landscaping and seeking damages "to pay for correcting the allegedly defective work." Finkelstein did not assert that McAllister's defective work caused damage to any property other than the work product. Moreover, he did not claim any damage to the work product other than defective workmanship. *Id.* at 678.

In response to Finkelstein's suit, McAllister filed a declaratory judgment action to determine coverage. *Id.* The New Hampshire Supreme Court found no coverage under the policy issued to McAllister by Peerless Insurance Company. *Id.* at 679. In so doing, the court analyzed the definition of "occurrence" contained within the policy issued to McAllister, which is almost identical to the definition at issue here, and concluded:

> The fortuity implied by reference to accident or exposure is not what is commonly meant by a failure of workmanship. . . . Despite proper deference, then, to the reasonable expectations of the policyholder, . . . we are unable to find in the quoted policy language a reasonable basis to expect coverage for defective workmanship. [*Id.* at 680.]

The court then went on to hold that a general grant of coverage contained in a general coverage provision does not give rise to coverage for the cost of correcting defective work. *Id.* 680-681.

We agree with both the reasoning and the conclusion as expressed by the *McAllister* court. Accordingly, we hold that the defective workmanship of Vector, standing alone, was not the result of an occurrence within the meaning of the insurance contract. Summary disposition was properly granted on this issue.

IV

Vector next appears to argue that regardless whether the use of inferior concrete constituted an occurrence within the meaning of the insurance contract it is still entitled to coverage because the removal and replacement of the grit building roof constituted "physical injury to or destruction of

tangible property" within the meaning of "property damages" as defined by the contract and, under the terms of the insurance contract, "Hawkeye must pay all sums that Vector had become legally obligated to pay because of property damage." Vector is mistaken.

The insurance contract defines "property damages" as either:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period . . . .

This definition appears under the heading "Definitions Applicable To Section II." Section II requires that property damages arise out of an "occurrence" before Hawkeye is required to provide coverage. As the use of inferior cement does not constitute an occurrence within the meaning of the insurance contract, the condition precedent for seeking coverage for property damage has not been met. This definition does not give rise to a duty to defend or indemnify.

V

Vector argues that the trial court incorrectly relied on exclusion (n) in granting summary disposition to Hawkeye. Exclusion (n) provides:

> This insurance does not apply
>
> *     *     *
>
> to property damage to the named insured's products arising out of such products or any part of such products . . . .

Vector asserts that this exclusion, contained in the main text of the insurance contract, is superseded by three endorsements or riders to the general insurance contract. We disagree.

When a conflict arises between the terms of an endorsement and the form provisions of an insurance contract, the terms of the endorsement prevail. *Peterson v Zurich Ins Co*, 57 Mich App 385, 392; 225 NW2d 776 (1975).

Vector first asserts that exclusion (n) is superseded by the language set forth on the cover sheet of the "Special Multi-Peril Policy" endorsement. This language provides in pertinent part:

> In consideration of the payment of premium and in reliance upon the staements [sic] in the Declarations and subject to the Limit of Liability, Exclusions, Conditions, and other terms of this policy, the Company . . . agrees with the insured . . . to provide coverage with respect to those designated premises, coverages and kinds of property for which a specific limit of liability is shown in the Declarations.

This language is merely a preface to the "Special Multi-Peril Policy." It states only that coverage is supplied as indicated in the policy and the exclusions. Accordingly, it does not contradict and hence supersede exclusion (n).

Vector's second assertion is that an "Extension Schedule," form no. GL 200940183, supersedes exclusion (n). On this schedule, underneath the heading "Description of Hazards," the following language appears:

> Concrete Construction-including foundations, making, setting up or taking down forms, scaffolds, false-work or concrete distributing apparatus . . . .

When construing the language of an insurance

contract, we give such language its ordinary and plain meaning and avoid technical and strained constructions. *Thomas v Vigilant Ins Co,* 156 Mich App 280, 282; 401 NW2d 351 (1986), lv den 428 Mich 895 (1987). If, after reading the entire contract, the language can be reasonably understood in differing ways, the ambiguity is to be liberally construed against the insurer. *Powers v DAIIE,* 427 Mich 602, 623-624; 398 NW2d 411 (1986).

Turning to the schedule in question, we believe that it is reasonable to infer that a form labeled "Extension Schedule" extends coverage to those items listed on the schedule, including "concrete construction." Our conclusion is bolstered by the following observations about the schedule. First, the schedule lists, next to each item, a premium base, a premium rate, and an advanced premium. Second, at the end of the schedule is the phrase "Additional Coverages," with reference to an attachment. Third, form no. GL 200940183 is expressly listed on the policy declaration sheet as "applying to Section II" of the insurance contract. Accordingly, we conclude that the schedule does extend coverage to concrete construction.

We also conclude that the term "concrete construction" is ambiguous and, by the insurance contract's terms, is not so limited as to exclude construction of a concrete roof.

However, we do not believe our reading of the Extension Schedule is at odds with exclusion (n). In *McAllister,* 124 NH 678-680, the court drew a distinction between coverage of property damage resulting *from* the defective work product and coverage of damage to the work product itself. The court concluded that the former was covered while the latter was not. *McAllister, supra.* We believe that this distinction is properly drawn and equally applicable in the instant case. Reading the general

insurance contract provisions in conjunction with the Extension Schedule we can only conclude that the schedule extends coverage to Vector for property damage resulting from inadequate concrete construction, e.g., property of a third party damaged when the concrete roof falls in on' that property. Exclusion (n) excludes coverage for damage to the work product, as occurred in the instant case. Accordingly, we conclude that the extension schedule and exclusion (n) are not in conflict and that the former does not supersede the latter.

Vector's third and final assertion is that the following language contained in the "Broad Form Comprehensive General Liability Endorsement" supersedes exclusion (n). The language of this endorsement provides in pertinent part:

> (A) The definition of incidental contract is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business.
> (B) The insurance afforded with respect to liability assumed under an incidental contract is subject to the following additional exclusions:
>
> *   *   *
>
> (4) to any obligation for which the insured may be held liable in an action on a contract by a third party beneficiary for bodily injury or property damage arising out of a project for a public authority; *but this exclusion does not apply to an action by the public authority or any other person or organization engaged in the project* . . . . [Emphasis added.]

This endorsement appears on form no. GL 204040682, and this form number is listed on the policy declaration sheet as "applying to Section II." As previously pointed out, there is no liability under § II absent an "occurrence." Without an

occurrence giving rise to initial coverage, the endorsement is meaningless.

In light of the foregoing, we do not believe that reversal is warranted for any of the reasons asserted by Vector.

VI

Vector's final argument is that the exception to exclusion (a), when read together with exclusions (n) and (o), creates an ambiguity in the insurance contract which must be construed in favor of coverage. Again, we disagree with Vector's argument.

The exclusions at issue provide:

> This insurance does not apply:
> (a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;
>
> *    *    *
>
> (n) to property damage to the named insured's products arising out of such products or any part of such products;
> (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith . . . .

In *Stillwater Condominium Ass'n v American Home Assurance Co,* 508 F Supp 1075 (D Mont, 1981), aff'd 688 F2d 848 (CA 9, 1982), cert den 460 US 1038; 103 S Ct 1429; 75 L Ed 2d 789 (1983), the United States District Court for the district of

Montana addressed the exact issue now before us. In resolving this issue, the court emphasized that exclusionary clauses limit the scope of coverage provided under the insurance contract; they do not grant coverage. *Id.* at 1079. Moreover, the court pointed out that each individual exclusion refers, not to the other exclusions, but to the hazards insured against *by the insurance contract.* Accordingly, "exclusions are to be read 'with the insuring agreement, independently of every other exclusion.'" *Id.,* quoting *Weedo v Stone-E-Brick, Inc,* 81 NJ 233, 248; 405 A2d 788 (1979). The court then stated:

> Further, the *Weedo* analysis is consistent with the all-risk nature of the CGL policy. To reiterate, the facts alleged in the *Stillwater* action are within the coverage of the insuring agreement standing alone. The exception to exclusion (a) preserves that coverage and brings it back within the broad all-risk coverage of the insuring agreement. Exclusions (l) and (m), the business risk or work product exclusions, however, remove the occurrences of the *Stillwater* action from the coverage granted by the insuring provision. The occurrences of the *Stillwater* action are not covered because the condominiums which are the basis of the damage are "the named insured's products" (exclusion [l]), and "work performed by or on behalf of the named insured" (exclusion [m]).
>
> * * *
>
> Plaintiff, however, urges the following analysis. The exception to exclusion (a) "grants" coverage for the occurrences of the *Stillwater* action. Exclusions (l) and (m) (the business risk exclusions) take away, or are in juxtaposition with, the coverage "granted" in the exception to exclusion (a). Therefore ambiguity arises and coverage results. *See, e.g. Commercial Union Assur Companies v Gollan,*

[118 NH 744] 394 A2d 839, 842 (1978). This analysis, however, is inapposite because the coverage supposedly "granted" by the exception to exclusion (a) has already been granted in the insuring provision. Having been granted in the insuring provision, that coverage is subject to the limitation of each and every exclusion. [*Id.*]

Therefore, the court concluded that no ambiguity was created by the three exclusions. *Id.* at 1079-1080.

We find the logic of *Stillwater* persuasive. Therefore, we conclude that the exclusions are not to be read cumulatively, but individually. Doing so, we conclude that each, standing alone, is clear and unambiguous. Exclusion (a) and the exception contained therein do not create coverage. Moreover, a reasonable and practical construction of the exclusions reveals that they apply as found by the trial court. The trial court properly granted summary disposition. But see *Fresard v Michigan Millers Mutual Ins Co,* 97 Mich App 584; 296 NW2d 112 (1980), aff'd by an equally divided Court 414 Mich 686 (1982), reh den 417 Mich 1103 (1983).[1]

## VII

For all these reasons we conclude that the insurance contract in question does not extend coverage to Vector on the circumstances of this case. Accordingly, the trial court properly granted summary disposition in favor of Hawkeye.

Affirmed.

---

[1] The panel in *Fresard* adopted the minority view. See *St Paul Surplus Lines Ins Co v Diversified Athletic Services,* 707 F Supp 1506, 1510 (ND Ill, 1989).