**J.Z.G. RESOURCES, INC., Plaintiff–Appellee–Cross–Appellant,**

v.

**Edward E. KING and Shelby Insurance Co., Defendants–Appellants–Cross–Appellees,**

**C. James Osborne, Jr., R.L.S., P.C., Defendant.**

Nos. 183, 185, 311, Dockets 92–7178, 92–7208, 92–7210.

United States Court of Appeals, Second Circuit.

Argued Sept. 24, 1992.

Decided Feb. 26, 1993.

Mark G. Barrett, White Plains, NY (Boeggeman, George, Jannace & Hodges, P.C., of counsel), for defendant-appellant-cross-appellee Edward E. King.

James Donohue, White Plains, NY (Harold Merran, Donohue & Locker, of counsel), for defendant-appellant-cross-appellee Shelby Ins. Co.

Alan D. Singer, White Plains, NY (Mark D. Ginsburg, Davis and Singer, P.C., of counsel), for plaintiff-appellee-cross-appellant.

Before: NEWMAN, WINTER, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

The appeals and cross-appeal in this case are taken from a judgment of the United States District Court for the Southern District of New York entered January 22, 1992, Gerard L. Goettel, *Judge,* in favor of

plaintiff-appellee-cross-appellant J.Z.G. Resources, Inc. ("JZG") against defendant-appellant-cross-appellee Edward E. King for $400,000, and against defendant-appellant-cross-appellee Shelby Insurance Co. ("Shelby") for $300,000. The judgment also dismissed the complaint against defendant C. James Osborne, Jr., R.L.S., P.C. ("Osborne P.C.").

King and Shelby appeal the judgments against them. JZG cross-appeals from the judgment insofar as it limits its recovery against Shelby to $300,000 and denies prejudgment interest. No appeal is taken from the dismissal of JZG's complaint against Osborne P.C.

We reverse the judgment against Shelby and affirm in all other respects.

### Background

JZG, a New York corporation, is a residential real estate development company that owns a parcel of land in the Town of Southeast, Putnam County, New York (the "Town") on which there is a development known as Peach Brook Farms. King, doing business as E.E. King Co., is an excavation and road building contractor. Shelby is an Ohio corporation authorized to write policies of liability insurance in the State of Connecticut. Subject matter jurisdiction in this case is premised upon diversity of citizenship pursuant to 28 U.S.C. § 1332 (1988).

King had a commercial general liability ("CGL") insurance policy (the "Policy") with Shelby which included products-completed operations hazard ("PCOH") coverage. The Policy provided coverage from July 30, 1988 to July 30, 1989, but was cancelled on December 5, 1988 because of King's failure to pay premiums.

On April 27, 1988, JZG entered into a contract with King (the "Contract"), under which King agreed to construct and install three subdivision roads in the Peach Brook Farms development. The roads were to be named Peach Brook Lane, Fair Meadow Drive, and St. James Place. After the roads were completed and approved by the Town, they were to be dedicated to the Town.

King agreed in the Contract that all work would be in conformity with JZG's plans and would meet or exceed the requirements and specifications of the Town and the State of New York. King also guaranteed the work for one year and agreed to indemnify JZG for any attorney fees that JZG might incur as a result of a breach of the Contract by King. In addition, King agreed to "maintain and pay for Workmen's Compensation and public liability insurance, property damage, completed operations or product liability insurance and such other insurance as required by [*inter alia*, JZG]." The Contract further provided that JZG was to be "list[ed] ... as an additional insured on a certificate of insurance for liability coverage."

King had visited the site before entering into the Contract, at which time construction access roads had been cleared in order for heavy equipment to enter the area, and stakings had been placed to indicate where the actual roads were to be located. These stakings had been placed in October 1987 by Robert H. Bergendorff, a licensed surveyor, at the direction of JZG. Although it was contested at trial whether the stakes indicated the proper roadway elevations, the district court found that they did not, and that the elevation information was only available in documents in Bergendorff's possession known as "cut sheets."

King commenced construction of the roads in July 1988, relying solely upon the stakes for the proper elevation of the roadways. In August of that year, Richard Palmer, the Town highway superintendent, asked King for a survey that would confirm that the roads as built conformed to the plans approved by the Town. King employed Stephen Osborne, a cousin of one of his employees, to do the survey. Although Stephen Osborne was an employee of Osborne P.C., a licensed surveyor, he was not licensed to survey. It was contested at trial whether Stephen Osborne advised King that there were elevation problems, as Osborne contended, or did not, as King maintained. In any event, King delivered to Palmer a letter on the stationery of Osborne P.C., purportedly signed by C.

James Osborne, Jr., which indicated that the road locations and elevations were proper. In fact, King forged the Osborne signature and later pled guilty to a criminal charge relating to the forgery. The letter, however, prompted Palmer to permit King to pave the roads.

By the spring of 1989, King had finished the road work except for the top coat and curbing. He then informed JZG that he had suffered substantial financial reversals and could not complete the remaining work required by the Contract. In order to complete the job, JZG called in another contractor that commissioned its own survey and discovered that the roads laid by King varied significantly from the pertinent specifications. The surveyor reported that one road was out of place, the elevations were seriously amiss for two of the roads, and some of the roads were badly tilted to the side.

Meanwhile, approximately six homes had been constructed in the development and had been issued certificates of occupancy by the Town, and the roads in question were being used regularly by motorists. However, the Town refused to accept the roads for dedication, and accordingly refused to assume responsibility for maintenance and snow removal until the deficiencies in the roads had been corrected and the roads conformed to the specifications in the plans the Town had approved. Negotiations between JZG and the Town concerning a possible compromise were fruitless.

JZG subsequently commenced this action against King, claiming breach of contract and negligence; Osborne P.C., claiming negligent surveying; and Shelby, claiming that King had obtained CGL and PCOH insurance from Shelby in which JZG was a named insured. JZG sought a "minimum" of $350,000 damages from all defendants on all claims, and an additional "minimum" of $50,000 on its contract claim against King for attorney fees.

In findings of fact and conclusions of law entered December 30, 1991, the district court determined that King was negligent in installing all the roadways at improper grades and elevations and one road in the wrong location, and accordingly found King liable for the cost of removing and reconstructing the roads to put them in appropriate condition for acceptance by the Town. The court determined the resulting damages to be $350,000, and added $50,000 on the contract claim against King for attorney fees. The court dismissed the claim against Osborne P.C., finding no privity between JZG and Osborne P.C., and no basis for a claim of negligent misrepresentation against Osborne P.C. Deeming JZG's claim against Shelby "the most difficult aspect of this case," the court determined Shelby to be "liable for the limit of its liability, namely, $300,000." In a subsequent memorandum decision entered February 26, 1992, the district court denied JZG's postjudgment application for prejudgment interest.

Appeals by King and Shelby, and a cross-appeal by JZG, then ensued.

### Discussion

We affirm the district court's denial of prejudgment interest substantially for the reasons stated in that court's memorandum decision entered February 26, 1992, including JZG's failure to make any application for prejudgment interest until after judgment in its favor had been entered. We rely upon the district court's findings of fact and conclusions of law with respect to, and affirm, all other aspects of the judgment on appeal [1] except the determina-

---

1. King contends on appeal that any award to JZG must be reduced by the balance outstanding to him from JZG on the Contract. The district court found, however, that "King was paid for the work he had done to [the] date" when he terminated performance under the Contract. This finding is not clearly erroneous. We note that King made a conclusory claim in his initial appeal brief that only $143,860.13 had been paid to him on the total Contract price of $236,000.00. JZG responded that: (1) the same trial exhibit upon which King relied for the $143,860.13 figure showed additional payments of $45,966.01 to third parties on King's behalf against total invoices of $180,477.93; and (2) King was raising the underpayment issue for the first time on appeal. Although JZG's contention appears to be a fair reading of the pertinent trial exhibit, King's reply brief did not respond to these arguments, but simply asserted

tion that Shelby was liable to JZG for $300,000 pursuant to the Policy. The balance of this opinion will address only the issue of Shelby's liability.

JZG named Shelby as a defendant on the basis, as pleaded in JZG's complaint, that (1) the Contract required King to obtain CGL insurance that included PCOH coverage and named JZG as an insured, and (2) Shelby provided a certificate of insurance to JZG which stated that this had been done. Although the Contract contained such a requirement JZG was not in fact named as an insured in the Policy, and the certificate of insurance provided by King to JZG did not name JZG as an insured.

It is undisputed, however, that if Shelby were required to indemnify King under the Policy for King's liability to JZG, the indemnification would inure to the benefit of JZG. Indeed, the Policy explicitly provides that: "A person or organization may sue [the insurer] to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial...." Further, New York law expressly requires the inclusion of such a provision in any policy of liability insurance. *See* N.Y.Ins. Law § 3420(a)(2) (McKinney 1985). We therefore proceed to the merits of the issue of insurance coverage.

As stated earlier, the Policy is a CGL policy with added PCOH coverage. Its basic coverage is for bodily injury and property damage for which King, the insured, might become liable to third parties. Obviously, the issue in this case is property damage rather than bodily injury. Although the parties did not brief the issue, the court inquired at oral argument whether the roads laid by King at Peach Brook Farms had suffered "property damage" as defined in the Policy, to wit:

   a.  Physical injury to tangible property, including all resulting loss of use of that property; or

   b.  Loss of use of tangible property that is not physically injured.

that *he* had been paid only $143,860.13 on in-

We do not regard the improper grades, elevations, and location at issue in this case as constituting "physical injury" to the roads. Further, the roads have certainly been put to use by the drivers who traverse them. The Town's refusal to accept the roads for dedication and undertake responsibility for maintenance and snow removal, however, would appear to result in a significant impairment of the roads' intended use by JZG. We will assume that there has been property damage under the Policy in the sense of "[l]oss of use of tangible property," although the question is not free from doubt.

The Policy further requires, however, that this property damage "be caused by an occurrence." "Occurrence," in turn, is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Coverage is expressly excluded for property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because [King's] work was incorrectly performed on it." This exclusion is inapplicable, however, to "property damage included in the products-completed operations hazard" coverage. The PCOH coverage extends to "property damage occurring away from premises [King] own[s] or rent[s] and arising out of ... [King's] work," provided that the work has been "completed or abandoned." Work is deemed completed, *inter alia*, "[w]hen that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." Furthermore, "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

The roads at Peach Brook Farms are clearly in use, and in any event, King has clearly abandoned his work at that site. Since "property damage" is insured, however, only when "caused by an occurrence," i.e., an "accident," the central issue on this appeal is whether the damage to the roads at Peach Brook Farms resulted from

voices totalling $180,477.93.

an "accident." The district court concluded that it did, stating:

> The errors made by King were accidental to the extent that he did not intend to build the roads in the wrong place at the wrong elevations. It was not an accident, however, in the popular use of the word as a single event. We conclude, albeit with some uncertainty, that what occurred here qualifies as an "occurrence."

In this diversity action, this conclusion must be tested by reference to New York law. The leading case is *Messersmith v. American Fidelity Co.*, 232 N.Y. 161, 133 N.E. 432 (1921). In that case, the insured entrusted his automobile to an underage driver who was involved in a collision. Although the lending was intentional, the ensuing collision was deemed an "accident." As the court explained: "The character of the liability is not to be determined by analyzing the constituent acts which, in combination, make up the transaction, and viewing them distributively. It is determined by the quality and purpose of the transaction as a whole." 232 N.Y. at 166, 133 N.E. at 433.

Courts have subsequently applied *Messersmith's* "transaction as a whole" test to a variety of facts. *See, e.g., Aetna Casualty & Sur. Co. v. General Time Corp.*, 704 F.2d 80, 81–83 (2d Cir.1983) (damage to valves caused by defective motors held "accident" under New York law); *McGroarty v. Great Am. Ins. Co.*, 36 N.Y.2d 358, 361, 363–65, 329 N.E.2d 172, 173, 175, 368 N.Y.S.2d 485, 487, 489–90 (1975) (excavation on adjoining property that resulted in damage to plaintiff's building deemed accident); *Corbetta Constr. Co. v. Michigan Mut. Liab. Co.*, 20 A.D.2d 375, 380, 247 N.Y.S.2d 288, 292–93 (1st Dep't 1964) (leaks in cofferdam that resulted in damage to adjacent building constituted accident), *aff'd mem.*, 15 N.Y.2d 888, 206 N.E.2d 357, 258 N.Y.S.2d 423 (1965); *Wolk v. Royal Indem. Co.*, 27 Misc.2d 478, 482–85, 210 N.Y.S.2d 677, 682–83 (App.Term 2d Dep't 1961) (runoff from golf course that damaged adjoining property considered accident).

In all these cases, however, the claim against the insured was not simply one for faulty workmanship, but rather for consequential property damage inflicted upon a third party as a result of the insured's activity. More recently, this circuit has held that a CGL policy did not provide coverage for a claim against an insured for the repair of faulty workmanship that damaged only the resulting work product. In *Jakobson Shipyard, Inc. v. Aetna Casualty & Surety Co.*, 961 F.2d 387 (2d Cir. 1992), the insured shipyard built two tugboats for delivery to a barge company. *Id.* at 388. The steering mechanisms of the tugs were defective. *Id.* In affirming district court's summary judgment denying insurance coverage, we said:

> The damages sought were for damages to the tugs themselves resulting from the defective steering mechanisms. No damage to the property or persons of third parties was alleged or proven.
>
> \* \* \* \* \* \*
>
> Were we to construe the words "accident" or "continuous or repeated exposure to conditions" as encompassing damage to a product resulting from the product's failure to perform according to contract specifications, we would expand the agreed-upon coverage. An accident, given its dictionary meaning, is "an event or condition occurring by chance or arising from unknown or remote causes." *Webster's Third New International Dictionary* 11 (1981). We might add that in common parlance an external force of some kind is usually involved.

961 F.2d at 389. We distinguished our earlier decision in *General Time*, 704 F.2d at 83, on the basis that the defective motors sold by the insured in that case had caused damage to other property of the purchaser. *Jakobson*, 961 F.2d at 389–90.

The *Jakobson* ruling is consistent with the general concept of PCOH insurance, which has been described in these terms:

> The products hazard and completed operations provisions are not intended to cover damage to the insured's products or work project out of which an accident arises. The risk intended to be insured is

the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb.L.Rev. 415, 441 (1971) (footnote omitted).

Rulings in other jurisdictions support this analysis. In *McAllister v. Peerless Insurance Co.*, 124 N.H. 676, 474 A.2d 1033, 1035–37 (1984), PCOH coverage was held not to extend to the repair of faulty workmanship in constructing a leach field and performing landscaping. Noting the absence of any "claim that such defects had caused damage to any other property than the work product, ... [or of] any damage to the work product other than the defective workmanship," *id.*, 474 A.2d at 1035, the court stated that: "The fortuity implied by reference to accident or exposure is not what is commonly meant by a failure of workmanship." *Id.*, 474 A.2d at 1036.

Similarly, *United States Fidelity & Guaranty Corp. v. Advance Roofing & Supply Co.*, 163 Ariz. 476, 788 P.2d 1227 (Ct.App.1990), *review denied*, No. CV–90–0041–PR (Ariz. Apr. 17, 1990), denied PCOH coverage to a roofing contractor that was sued for failure to complete work in accordance with contract requirements. The court concluded that "mere faulty workmanship, standing alone, cannot con-stitute an occurrence as defined in the policy, nor would the cost of repairing the defect constitute property damages." *Id.*, at 482, 788 P.2d at 1233 (citing *McAllister*). The court reasoned: "If the policy is construed as protecting a contractor against mere faulty or defective workmanship, the insurer becomes a guarantor of the insured's performance of the contract, and the policy takes on the attributes of a performance bond." *Id.*

Finally, *Hawkeye–Security Insurance Co. v. Vector Construction Co.*, 185 Mich. App. 369, 460 N.W.2d 329 (1990), barred PCOH recovery by an insured concrete contractor that was liable to a third party for the provision of defective concrete. Noting that "Vector seeks what amounts to recovery for damages done to its own work product, and not damage done to the property of someone other than the insured," *id.*, 460 N.W.2d at 333, the court ruled: "We agree with both the reasoning and the conclusion as expressed by the *McAllister* court. Accordingly, we hold that the defective workmanship of Vector, standing alone, was not the result of an occurrence within the meaning of the insurance contract." *Id.*, 460 N.W.2d at 334.

JZG seeks recovery from King only for the repair of the faulty roads that King constructed at Peach Brook Farms. Because the Policy does not provide coverage to King for this liability to JZG, Shelby is not liable to JZG for the judgment entered in favor of JZG against King.

## Conclusion

The judgment of the district court is reversed as to the $300,000 award against Shelby and remanded for dismissal of the complaint as to Shelby, and otherwise affirmed in all respects. Costs to Shelby against JZG. No costs to JZG or King.