DISSENT
COLE, Circuit Judge,
dissenting.
“If [a contract’s] plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonably expect to apply. If the language is ambiguous, longstanding principles of contract law require that the ambiguous provision be construed against the drafter.” Wilkie v. Auto-Owners Ins. Co., 469 Mich. 41, 664 N.W.2d 776, 787 (2003) (internal quotation marks omitted); see also Cole v. Auto-Owners Ins. Co., 272 Mich.App. 50, 723 N.W.2d 922, 924 (2006) (“A contract is ambiguous when its words may be reasonably understood in different ways.”). Because the language of the relevant exclusion in the insurance contract at issue is ambiguous, as indicated by our precedent in Blaine Construction Corp. v. Insurance Co. of North America, 171 F.3d 343 (6th Cir.1999), the provision should be construed in TMW’s favor, and against Federal.
As the majority describes, the relevant exclusion, entitled “Planning, Design, Materials Or Maintenance” (the “Faulty Workmanship exclusion”), reads as follows:
This insurance does not apply to loss or damage (including the costs of correcting or making good) caused by or resulting from any faulty, inadequate or defective:
• planning, zoning, development, surveying, siting;
• design, specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, compaction;
*581 • material used in repair, constructions, renovation or remodelling; or
• maintenance,
of part or all of any property on or off the premises shown in the Declarations. This Planning, Design, Materials Or Maintenance exclusion does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded.
The parties’ dispute centers on the meaning of the “Ensuing Loss clause,” which states that the Faulty Workmanship exclusion “does not apply to ensuing loss or damage caused by or resulting from a peril not otherwise excluded.” The policy does not define “ensuing,” “caused” or “resulting,” but the ordinary meaning of each of these words is largely the same: “to ensue” may be defined as “to follow as a chance, likely, or necessary consequence” or “to follow in chronological succession;” “to cause” as “to serve as cause or occasion of’ or to “bring into existence;” and “to result” as “to proceed, spring, or arise as a consequence, effect, or conclusion.” Webster’s Third New International Dictionary (2002); see also Cole, 723 N.W.2d at 924 (“Unless otherwise defined, contractual language is given its plain and ordinary meaning.”). Thus, TMW argues, the plain language of the Ensuing Loss clause carves from the scope of the Faulty Workmanship exclusion any loss or damage that is brought about by a subsequent, non-excluded peril, even if a listed excluded peril is present earlier in the causal chain.
This interpretation of the policy wording is not perfect. But it is reasonable. It certainly does not, as the majority suggests, eviscerate the Faulty Workmanship exclusion. To the contrary, one readily may imagine a host of losses that would be excluded under TMW’s reading. Redesigning and installing a new heating system because the original ventilation plans were faulty, for example. Shoring up a foundation resting on loose soil, not discovered earlier because of inadequate surveying and siting, for another. A third: replacing defective fixtures that mistakenly were installed by an inattentive contractor during a renovation. None of these losses involves a subsequent, non-excluded peril, but all would involve considerable expense that an insurer in Federal’s position might well want to exclude. Similarly, in TMW’s view, Federal would be liable only for the costs of remedying the water damage that occurred here, but not for any of the costs involved in rectifying the construction defects that permitted this damage to happen, including removing the building’s exterior walls, properly reinstalling the moisture barrier, fixing and adding flashing in the cavity between the barrier and the exterior walls, replacing these walls, and drilling weep holes in the walls to permit moisture in the cavity to escape. Given that the very case before us features losses that would be excluded under TMW’s interpretation' — and given the near infinite number of similar conceivable losses — the majority’s claim that TMW’s reading is unreasonable because it “would create a virtual, if not complete, exclusion to the exclusion,” thereby “essentially undo[ing]” it, seems plainly incorrect.[1]
*582 Admittedly, while the countless losses associated with the “costs of correcting or making good” faulty, inadequate, or defective “design, specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, [or] compaction,” would be excluded under TMW’s interpretation, it is difficult to imagine any other losses that would not necessarily involve a later-in-time, non-excluded cause (and so would be covered by the policy under TMW’s reading). If this is the case, then the Faulty Workmanship exclusion’s reference in parentheses to losses “including the costs of correcting or making good” is redundant, violating the principle that insurance contracts be construed “so as to give effect to every word, clause, and phrase,” and avoid rendering “any part of the contract surplusage or nugatory.” Royal Prop. Group, L.L.C. v. Prime Ins. Syndicate, Inc., 267 Mich.App. 708, 706 N.W.2d 426, 432 (2005) (citing Klapp v. United Ins. Group Agency, Inc., 468 Mich. 459, 663 N.W.2d 447, 453 (2003)). But this problem is not sufficiently grave to reject TMW’s interpretation when both approaches suggested by the majority create equally (if not more) substantial redundancies, as well as other significant interpretive problems that the majority is at a loss to explain.
Moreover, the majority’s argument that none of the contingencies excluded under TMW’s interpretation involves loss or damage “caused by or resulting from” faulty workmanship — thereby rendering “any mention of causation nugatory” — considerably overstates the magnitude of the redundancy under this reading. The majority’s argument seems to be that TMW’s reading eliminates the causal relationship between faulty workmanship and “loss” or “damage,” since, for TMW, the faulty workmanship appears to be the loss or damage. But the majority’s argument is incorrect: Under TMW’s interpretation, these terms refer to the financial loss or damage resulting from faulty workmanship, not the faulty workmanship itself.[2] Thus, this reading certainly does not render “any mention of causation nugatory.” Rather — as illustrated by the examples offered above in support of TMW’s interpretation — the causal relationship is between the faulty workmanship and the costs of correcting or making it good, which are excluded under TMW’s reading of the contract.
Because the interpretation TMW offers is reasonable, even if an equally or more plausible interpretation of the contract existed that favored Federal, the policy should be construed in TMW’s favor, since the ambiguity created by two reasonable interpretations of a contract must be construed against its drafter. See Wilkie, 664 N.W.2d at 787; Cole, 723 N.W.2d at 924. In fact, though, the two readings of the *583 contract offered in Federal’s favor appear less plausible than TMW’s.
The first interpretation offered by the majority suggests that the Ensuing Loss clause simply performs a “belt and suspenders” function by reminding the reader that, “if an exclusion does not apply, then coverage exists.” In support of this interpretation, the majority argues that the contract “repeats this coverage-off, coverage-on language or slight variations on it in seven other places in the contract, suggesting that it flows from the kind of systematic and formulaic precision, sometimes overdone precision, in which lawyers often seem to take great pleasure.” This argument, however, ignores that the policy also includes, not just slight, but materially different variations on the Ensuing Loss clause. For instance, from eight other exclusions, only “specified perils” — defined by the contract as aircraft or self-propelled missiles, explosion, fire, leakage from fire protection equipment, lightning, mine subsidence, riots or civil commotion, sinkhole collapse, smoke, vandalism, vehicles, volcanic action, and windstorm or hail — are carved out, not all “perils not otherwise excluded.” Still other exclusions, like that for losses due to war and military action, carve out neither “specified perils” nor all “perils not otherwise excluded,” stipulating instead that they apply “regardless of any other cause or event that directly or indirectly ... contributes in any sequence to ... the loss or damage, even if such other cause or event would otherwise be covered.” The differing treatment of non-excluded causes under the different exclusions indicates that Federal intended the Ensuing Loss clause to do more than merely provide a formulaic reminder that coverage exists only when not excluded.
Even overlooking this problem, the belt- and-suspenders interpretation remains implausible. It seems doubtful that a purchaser of a commercial insurance policy would require a single reminder that it covers only those losses that are not excluded when the clause providing coverage — the first in the policy form — states clearly: “We will pay for direct physical loss or damage ... caused by or resulting from a peril not otherwise excluded.” But, according to the reading posited by the majority, Federal drafted the policy to include eight such reminders. Particularly in light of the principle that insurance contracts be read “so as to give effect to every word, clause, and phrase,” and avoid rendering “any part of the contract sur-plusage or nugatory,” Royal Prop. Group, L.L.C., 706 N.W.2d at 432, this seems a singularly strange reading of the policy, which perhaps is why Federal has not endorsed it.[3]
*584 The majority goes to considerable length to avoid the conclusion that this interpretation renders surplus the eight clauses addressing ensuing losses, arguing instead that the law abounds with such redundancies and suggesting that there is a difference between “true” and “logical” superfluousness. Whether these clauses are in fact redundant is largely secondary to the more fundamental problem with the belt- and-suspenders interpretation; namely, that it ignores the strong indication, given the different treatment non-excluded causes receive under different exclusions in the policy, that Federal intended the “ensuing loss” language to be more than a formulaic reminder that losses are covered, except when they are not. Thus, the conflict between this interpretation of the contract and TMW’s would remain even if these redundancies did not exist. Nonetheless, it bears noting that the principle that insurance contracts be read so as to avoid surplusage is well-established in Michigan law, and we are not free to ignore it. By contrast, the majority offers no support for its purported distinction between “true” and “logical” redundancies, and it is difficult to imagine a better illustration of surplusage than the eight unnecessary reminders that the majority would have us read into the contract. Indeed, the very idiom the majority has chosen to explain this interpretation suggests that a second, superfluous tool (suspenders) is being used where the first (the belt) would do. Cf Oxford Dictionary of English Idioms (2005) (defining this idiom as “providing double security by using two means to achieve the same end”). The majority’s argument that these reminders are not redundant thus does little to increase the plausibility of this interpretation of the contract.
The second interpretation suggested by the majority — this one also offered by Federal' — -is equally problematic. Under this reading, the scope of the Faulty Workmanship exclusion extends to the natural, probable, and foreseeable consequences of faulty construction and the other perils listed in the exclusion; conversely, the Ensuing Loss clause covers only separate and independent, non-foreseeable losses caused by non-excluded perils. Reaching this result, however, requires reading quite a lot into the plain language of the contract. As plainly written, the Ensuing Loss clause does not cover only “ensuing loss or damage caused by or resulting from a peril not otherwise excluded that is not the natural and foreseeable consequence of a peril listed above,” nor does it cover only “separate and independent ensuing loss or damage caused by or resulting from a peril not otherwise excluded.” Rather, the plain language of the clause, which we are compelled to follow, see Cole, 723 N.W.2d at 924, suggests that any loss “caused by or resulting from a peril not otherwise excluded” is covered. If Federal had intended the Ensuing Loss clause to preserve coverage only for separate and independent losses, it could have drafted contractual language to say so clearly, just as in the several exclusions that apply “regardless of any other cause or event that directly or indirectly ... *585 contributes in any sequence to ... the loss or damage, even if such other cause or event would otherwise be covered,” it employed language that plainly excludes such losses.
This interpretation also falls afoul of the principle that insurance contracts be read to give effect to all language and render no language surplusage or nugatory. See Royal Prop. Group, L.L.C., 706 N.W.2d at 432. Again, under this reading of the contract, the Faulty Workmanship exclusion extends to the natural, probable, and foreseeable consequences of the listed perils, and the Ensuing Loss clause preserves coverage only for separate and independent losses caused by non-excluded perils. But if the exclusion extends to the natural, probable, and foreseeable consequences of the listed perils, the Ensuing Loss clause does no work, as the limit it supposedly provides already is inherent in the scope of the exclusion. The Ensuing Loss clause, therefore, is surplusage or nugatory.
In sum, neither interpretation of the contract offered in favor of Federal seems any more plausible than the one TMW offers: Both create equally (if not more) substantial redundancies and additional interpretive problems that the majority cannot explain. At best, these readings are reasonable alternatives to TMW’s interpretation, in which case the resulting contractual ambiguity still must be resolved against Federal. See Wilkie, 664 N.W.2d at 787; Cole, 723 N.W.2d at 924. In reaching the opposite conclusion, the majority misconstrues the role that the canons regarding contractual redundancy and ambiguity play under this analysis. Contra the majority’s suggestion, the principle that contracts be interpreted to avoid sur-plusage does not create the ambiguity here. Rather, the ambiguity exists because TMW has offered a reasonable interpretation of the insurance policy, which the majority erroneously dismisses as “undoing” the Faulty Workmanship Exclusion. Because TMW’s reading is a reasonable one, the contract would have to be construed in its favor even if an equally or more plausible interpretation existed that favored Federal. That the readings favoring Federal create considerable interpretive problems — including, but by no means limited to, problems of redundancy — simply demonstrates that these interpretations are, if anything, less plausible than TMW’s. In other words, the majority is incorrect in stating that the anti-redundancy canon is “the key premise” “upon which TMW stakes this appeal,” and is “all TMW has to establish ... contractual ambiguity”: Even if these redundancies did not exist, the contract would remain ambiguous. By the same token, the majority’s skepticism of an approach “that invokes the anti-redundancy canon with one breath ... then closes its lips to the redundancy problems that arise with TMW’s interpretation,” is misplaced. That TMW’s reading violates this canon is readily conceded. But when the majority’s proposed readings do the same, while also creating additional significant interpretive problems, the resulting contractual ambiguity must be resolved against Federal.
This conclusion is firmly supported by our precedent in Blaine Construction Corp. v. Insurance Co. of North America. The insurance policy at issue in that case excluded “[ejrrors in design, errors in processing, [and] faulty workmanship or faulty materials, unless loss or damage from an insured Peril ensues and then only for such ensuing loss or damage.” 171 F.3d at 346. The insurer argued, as Federal does here, that “an ensuing loss, to be covered, must be the result of a new, separate and independent peril from the peril that is excluded, rather than a loss that follows naturally and ordinarily from an excluded peril.” Id. at 350 (internal *586 quotation marks omitted). We rejected this argument: Relying on Farmers Chemical Ass’n v. Mainland Casualty Co., 421 F.2d 319 (6th Cir.1970), we determined that it was ambiguous whether the loss (like here, water damage caused by construction defects) was excluded under the first clause of the exclusion or preserved under the second, and so resolved the ambiguity in favor of the insured. Id.; see also Eckstein v. Cincinnati Ins. Co., 469 F.Supp.2d 455, 461-62 (W.D.Ky.2007) (considering similar policy provisions and holding that “[tjhere is nothing ... to indicate that an ensuing loss must be the result of a separate cause from the excluded loss. To the contrary, the policies are clear that faulty construction losses are excluded, but losses taking place afterward ... are covered.”). While the insurance policies in Blaine Construction and Farmers Chemical were governed by Tennessee law, the relevant principles of contractual interpretation are the same as in Michigan. See, e.g., Hollis v. Doerflinger, 137 S.W.3d 625, 629 (Tenn.Ct.App.2003) (“When an insurance contract is susceptible to more than one reasonable interpretation, it is considered ambiguous. Tata [v. Nichols], 848 S.W.2d [649,] 650 [(Tenn.1993)]. In such a case, the language must be construed in favor of the insured. See, e.g., Allstate Ins. Co. v. Watts, 811 S.W.2d 883, 886 (Tenn.1991).”). The majority’s decision today creates the strange result that an Ensuing Loss clause identical to the one the majority now construes in favor of Federal would be construed in favor of TMW in Tennessee, despite the States’ common principles governing contractual interpretation.
As Federal concedes, “various courts throughout the country” have disagreed, in interpreting ensuing loss clauses, regarding “whether [the] ensuing loss must be a loss separate and independent from the excluded peril ... or whether coverage is given back for the natural, probable and foreseeable consequences of the excluded peril.” (Appellee Br. 49.) The very fact that reasonable jurists (including the members of this panel) have disagreed regarding the meaning of these clauses cuts in favor of finding against their drafters. For this reason and those presented above, I would not remand this ease for the district court to determine whether the losses TMW suffered were proximately caused by faulty construction — a question that is relevant only if we construe the contract in Federal’s favor. Instead, I would reverse the district court’s grant of summary judgment for Federal and find in favor of TMW.
Accordingly, I respectfully dissent.

. Federal argues that TMW's interpretation also is unreasonable because it violates the principle that an exception to an exclusion cannot create coverage for losses that the exclusion otherwise removes. However, the case that Federal cites for this proposition, Hawkeye-Security Insurance Co. v. Vector Construction Co., 185 Mich.App. 369, 460 N.W.2d 329 (1990), establishes no such principle. The court in Hawkeye-Security held only that exclusions cannot create coverage for losses that an insurance policy does not otherwise include, since "exclusionary clauses limit the scope of coverage provided under the insur- *582 anee contract; they do not grant coverage.” Id. at 336-37. This holding cannot readily be extended to exceptions to exclusions, as the purpose of such exceptions is to protect coverage already offered under the policy. Cf. id. at 336 ("The exception to [the] exclusion ... preserves [the coverage offered by the insuring agreement] and brings it back within the broad all-risk coverage of the insuring agreement.”) (internal quotation marks omitted).

. While the policy does not expressly define "loss” or "damage,” these terms encompass financial as well as physical deprivation. Cf. Webster’s Third New International Dictionary (2002) (defining "loss” as a "decrease in amount, magnitude, or degree,” or, more specifically, "the amount of an insured’s financial detriment due to the occurrence of a stipulated contingent event,” and damage as "injury or harm to person, property, or reputation,” or, more specifically, "the estimated reparation in money for detriment or injury sustained”).

. The majority notes that the parties addressed this interpretation at oral argument. It certainly is true that this interpretation was discussed — not surprisingly, since the majority repeatedly suggested it as a plausible reading of the contract. (See Oral Argument at 7:25, 8:20, 10:50, 24:35.) Even with this evident support for the belt-and-suspenders approach, however, Federal did not adopt it, instead arguing consistently only for the other interpretation the majority has offered. (See, e.g., id. at 13:05, 13:50, 15:45, 18:00, 21:10, 22:40.) Indeed, at one point during argument, the panel recognized Federal's reluctance to adopt the belt-and-suspenders approach. (Id. at 24:35 (“I really think your interpretation comes to nothing more than a belt and suspenders, that it truly accomplishes nothing. I guess it's probably hard for you to say that, and I can understand your resisting the point, but it does kind of seem that way.”) (Sutton, J.).) Following this comment, Federal’s counsel stated that she was not aware of any cases adopting the belt- and-suspenders approach in interpreting ensuing loss clauses (or of cases prohibiting insurers from drafting a contract in this manner), but that, “given that construction, it gives effect to the exclusion as a whole, as opposed to what I think [TMW] is focusing on, which is merely the last sentence of that *584 exclusion. And I think that that is fairly clear under Michigan law: that [TMW’s approach] is not how they [i.e., the Michigan courts] would interpret it [i.e., the contract].” (Id. at 25:00.) In other words, while counsel was willing to countenance the majority’s reading, she immediately returned to a line of attack she thought better supported by Michigan case law. Particularly when viewed in light of the remainder of Federal’s argument, focusing exclusively on the second interpretation the majority offers, counsel’s response does not suggest endorsement of the belt-and-suspenders reading; to the contrary, it indicates the opposite.