**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0364n.06
Filed: June 23, 2008

**No. 07-1803**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ESSEX INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FIDELITY & GUARANTY INSURANCE | ) | EASTERN DISTRICT OF MICHIGAN |
| UNDERWRITERS, INC., a wholly owned | ) | |
| subsidiary of St. Paul Fire & Marine Insurance | ) | |
| Company, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: GIBBONS and SUTTON, Circuit Judges; and ACKERMAN, District Judge.[*]

SUTTON, Circuit Judge. Essex Insurance filed this action seeking a declaration that its contract with Allstate Roofing & Paving excludes coverage for water damage caused by a storm that arose while the company was replacing a roof. Because Essex has not established that any of the coverage exclusions in Allstate Roofing's policy apply, we affirm.

I.

On June 23, 2001, Peppina's Restaurant, located in Lincoln Park, Michigan, agreed to pay Allstate Roofing $22,000 to replace its existing roof with a membrane roof. Membrane roofs, the

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

parties tell us, frequently are used to cover flat roofs, often use a rubber material and often require the use of heat to seal the roof during the installation process. *See also* Wikipedia, Membrane Roofing, http://en.wikipedia.org/wiki/Membrane_roofing ("Membrane roofing is a type of roofing system for buildings . . . used on flat or nearly flat roofs to prevent leaks and move water off the roof."). As part of this agreement, Allstate Roofing promised Peppina's that it would insure the project, a precondition to obtaining a building permit to make the repairs. *See* http://lincolnpark.govoffice.com (follow City Departments Link to Building Page). On July 4, Allstate Roofing purchased a one-year commercial liability policy from Essex Insurance, and on July 6, Allstate Roofing obtained the permit required to construct the new roof.

After Allstate Roofing had removed a portion of the existing roof, an (apparently) unforeseen storm popped up. Allstate Roofing placed tarps over the exposed area of the roof, but the protective covering did not do the trick, and water soon flooded the restaurant, causing over $1.2 million in damage. Allstate Roofing notified Essex of the damage. After Essex investigated the claim, it declined coverage.

St. Paul Fire & Marine Insurance Company (the parent company of Peppina's insurance carrier, Fidelity & Guaranty Insurance Underwriters) filed a lawsuit against Allstate Roofing in federal court, seeking damages for the company's negligence and breach of contract. On August 23, 2004, Essex (a Delaware corporation based in Virgina) filed this declaratory-judgment action against St. Paul (a Minnesota corporation), Peppina's (a Michigan business) and Allstate Roofing (also a Michigan business), seeking a declaration that the policy did not cover the restaurant's loss. Both

No. 07-1803
*Essex Ins. Co. v. Fidelity & Guar. Ins. Underwriters et al.*

sides moved for summary judgment. Of relevance here, the district court granted summary judgment against Essex on its claim for relief from liability for the damage to the restaurant. Essex appealed.

## II.

Essex disclaims insurance coverage based on two provisions in the insurance contract, one of which precludes coverage for damages arising out of membrane-roofing operations, the other of which precludes coverage if the company failed to take prudent steps when removing a portion of an existing roof. Here is what the policy says:

> The coverage under the policy does not apply to . . . any injury, loss or damage arising out of:
>
> 1. Your failure to take prudent steps in advance of any job or work commencing to determine the weather expected by your local weather bureau for that period of time you will be working on any given day, in order to preclude any open roof during any wind, hail, snow, rain, ice or any combination of these; and
>
> 2. Your having any "open roof" when any weather in 1. above occurs; any "open roof" must be covered in advance of any precipitation and in advance of your leaving the job for any period of time. You must provide appropriate temporary covering, able to withstand the normal elements; and/or
>
> 3. Any operations involving any hot tar, wand, open flame, torch or heat applications, or membrane roofing . . . .
>
> The term "appropriate" as used here means actions customarily and normally taken/used by similar contractors in your area to protect or prevent damage . . . .

JA 31.

## A.

Essex first invokes the membrane-roofing exclusion. As the insurance company reads this exclusion, it applies to any damage that occurs at any point during the installation of a membrane roof, an interpretation that would cover this incident because the damage arose after the company had removed a portion of the prior roof and before it had begun installing the new roof over that area. That, however, is not quite what the exclusion says. It refers to "damage arising out of . . . operations involving . . . membrane roofing," not to damages related in any way to a membrane-roofing job. The "operations involving" clause most naturally covers parts of the project—namely, when the roofers install the membrane roofing itself and use the necessary heating instruments for doing so—not to the entire project itself, from the minute the workers arrive at the work site to the minute they leave.

Other parts of the exclusion reinforce this reading. The "operations involving" language not only modifies "membrane roofing," but it also modifies discrete tasks like the use of "open flame, torch or heat applications," which encompass just *parts* of a roofing project. JA 31. A consistent reading of the "operations involving" language thus applies just to those harms caused in part by the actual, not the potential future, use of "open flame, torch or heat applications, or membrane roofing."

Also supporting this construction is the fact that membrane-roofing operations pose risks distinct from those created by other roofing activities. Some membrane-roofing operations require the use of an open flame to meld watertight materials, as the contract in this case contemplated, and even those that do not require heat still involve flammable adhesives that increase the risk of fire. *Cf. B Hall Contracting Inc. v. Evanston Ins. Co.*, No. 06-11088, 2008 WL 942937, at *4 (5th Cir.

No. 07-1803
*Essex Ins. Co. v. Fidelity & Guar. Ins. Underwriters et al.*

Apr. 8, 2008) (Weiner, J., concurring). Consistent with the "open flames, torch or heat applications" language that accompanies the membrane-roofing exclusion, it makes sense to construe the phrase to cover those parts of membrane roofing that pose similar risks to these other excluded operations and that make membrane-roofing installation distinct from other roof installations.

Or perhaps the membrane-roofing exclusion could be construed as covering damages *after* the roof has been installed. Membrane roofs, the parties tell us, frequently cover flat or low-sloped roofs, and, as many an occupant of a Frank Lloyd Wright house well knows, such roofs are more vulnerable to leaking and wear and tear than sloped roofs. *See* Joe Milicia, *Bed and Wright-fest: Stay in a Frank Lloyd Wright home*, USATODAY.com, http://www.usatoday.com/travel/ destinations/2005-01-03-frank-lloyd-wright_x.htm (noting that "flat, leaky roof[s]" were a "Wright trademark"); Arrol Gellner, *Why Roofs Leak*, http://www.doityourself.com/stry/whyroofsleak ("The occupants of Frank Lloyd Wright's most celebrated houses have been obliged to drag out buckets, bowls, and soup cans in many a rainstorm.").

Whether the exclusion relates to damages during the actual installation of the roof or damages incurred after its installation, however, neither type of loss occurred here. The damage to Peppina's occurred because an untimely storm let loose when the roof was open—a risk common to all roof-replacement projects, whether they involve heat applications or not, whether they deal with a flat roof or a sloped one. Essex offers no reason why the parties would exclude coverage for this common roofing risk due to the serendipity that the company planned to place a membrane roof, rather than a tile or shingle roof, over the open portion. If Essex's interpretation is correct,

moreover, it would seem that Allstate Roofing paid for an insurance policy that excluded from coverage every facet of the project for which the policy initially was acquired. Although Allstate contracted with Essex for a general liability policy, the date of the contract (July 4, 2001) and Allstate's promise to Peppina's that it would insure the project shows that Allstate purchased the policy with this project in mind. Because the damage to the restaurant had nothing to do with any specific membrane-roofing act but arose out of Allstate's failure adequately to cover a portion of the roof that had been removed, an operation common to all roof replacements, the exclusion does not apply.

The testimony of Essex's roofing expert—that "'roofing operations' . . . encompass[] the entire process of the project from A to Z" and that "membrane roofing operations" include "having an open roof for a period of time," JA 424—does not change this conclusion. One way to read the exclusion, we realize, is that it covers a membrane-roofing job "from A to Z." But an expert's unsurprising testimony to that effect does little to promote that interpretation if it does not account for the clause in context and never explains why a roofing company would purchase coverage for a membrane-roofing job that provides no coverage for a membrane-roofing job "from A to Z." These considerations, together with the governing Michigan-law requirement that we "strictly construe[]" insurance exclusions in favor of the insured, *McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525, 528 (Mich. Ct. App. 2001), prevent coverage in this instance.

B.

That leaves the open-roof exclusion. It applies when Allstate Roofing "fail[s] to take prudent steps in advance of any job . . . to determine the weather . . . *and* . . . [fails to] provide appropriate temporary covering." JA 31 (emphasis added). The exclusion thus applies only if Essex can prove that Allstate Roofing *both* failed to check the weather *and* failed to cover the section of open roof appropriately.

It is true that there is sometimes "more to 'and' than meets the eye" and that we cannot rest our interpretation of the contract solely "on the intuition that 'and' means 'and,' 'or' means 'or,' and never the twain shall meet." *OfficeMax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005). But it remains the case that "'and' presumptively should be read in its 'ordinary' conjunctive sense," *id.* at 589, a presumption that makes particular sense here for two reasons. The requirement that we "strictly construe[]" exclusion provisions, *McKusick*, 632 N.W.2d at 528, favors a conjunctive reading of "and." And so does the fact that the contract used "and/or" to separate the open-roof exclusion provisions from the "operations involving" exclusion provision. By using "and" to separate the first two paragraphs and "and/or" to separate the second and third paragraphs, the drafters of the policy showed that they understood the difference between "and" and "and/or." Our interpretation gives content to this distinction, and indeed at oral argument counsel for Essex conceded that "and" should be read conjunctively here.

While this conjunctive reading of "and" required Essex to establish that Allstate Roofing failed to check the weather *and* failed to cover the section of open roof appropriately, Essex proved

neither. First, there is no record evidence showing that Allstate Roofing failed to check the weather before working that day. The only evidence in the record on this point is inadmissible and at any rate cuts against Essex. The hearsay statement of Tony Delmaro, Allstate Roofing's employee, says that he *did* check the weather and it was "suppose[d] to be clear [and] 90 degrees" on the day of the incident. JA 165. Essex in short has not met its burden of establishing the first requirement for this exclusion.

Nor has it met its burden of establishing the second requirement. To make its case that Allstate Roofing failed adequately to cover the open roof, Essex points to (1) pictures of the roof taken after the incident, (2) the report of its investigator, Crawford & Company, (3) the opinion of its roofing expert, Thurman Freeman, and (4) the transcript of an interview Crawford & Company took of Tony Delmaro (one of the primary supervisors over the Peppina's job). But Delmaro's recorded statement is classic hearsay, *see Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 718–19 (6th Cir. 2005) (holding that the post-accident interview of a witness was not admissible as substantive evidence), and hearsay evidence cannot establish facts necessary either to prove or to fend off summary judgment, *see Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Delmaro's statement, moreover, is the only independent evidence of what Allstate Roofing did or did not do to prevent the water damage. That dooms the reports upon which Essex also relies because their conclusions are premised on that same interview, making the reports themselves (or at least the material parts of the reports) inadmissible. *See Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994).

The remaining competent evidence regarding Allstate Roofing's efforts to cover the roof consists of (1) photographs showing that the company placed a tarp over the open portions of the roof and (2) Freeman's expert opinion that protective tarps are "not even a remotely adequate means of keeping water out of a commercial building." JA 392. The photographs themselves are of little use because Essex offered no coherent theory to explain when they were taken or exactly what they purport to show. Essex's claim adjuster (Freeman) determined that Peppina's loss was not covered by the policy because there was "no evidence" that Allstate Roofing paid attention to the "visual cues" that precede an impending storm or that it "sealed down" a covering on the roof. JA 203. But an absence of evidence cannot sustain Essex's burden. Without any proof of how quickly the July 21 storm arose, what exact steps Allstate Roofing took and what more an average roofer in that area would have done under the precise conditions the company faced that afternoon, Essex has not provided enough evidence to establish that the exclusion applies.

Essex's principal objection to this conclusion turns on the admissibility of the Delmaro interview by the accident investigator. It argues that the transcript satisfies the business-records hearsay exception. *See* Fed. R. Evid. 803(6). But because Essex wants to use the transcript as substantive evidence for the truth of the matters that *Delmaro* asserted, not merely to establish that he said those words, *see* Fed. R. Evid. 801, the transcript is hearsay within hearsay, and therefore needs an exception to cover both layers to be admissible, *see* Fed. R. Evid. 805; *United States v. De Peri*, 778 F.2d 963, 976–77 (3d Cir. 1985) (holding that proffered reports of interviews posed "a classic 'hearsay within hearsay' problem" and that to be admissible the interviewees' "out-of-court

statements . . . require[d] a separate hearsay exception"); *cf. Bondie v. Bic Corp.*, 947 F.2d 1531, 1534 (6th Cir. 1991) (holding that a report containing a party's statements was admissible because of "the combined effect of" two separate exceptions). Crawford & Company may well "regularly conduct[]" interviews of insurance claimants and create transcripts of those interviews, Fed. R. Evid. 803(6), but that at most means we can rely on the accuracy of the transcript and says nothing about the reliability of Delmaro's underlying assertions. Delmaro did not make the statement in the course of *his* regularly conducted business activity, *see Palmer v. Hoffman*, 318 U.S. 109, 113 (1943) ("[T]he fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act."), and no one argues that Delmaro's statement should be admissible as an admission of a party opponent, *see* Fed. R. Evid. 801(d)(2). The district court also did not abuse its discretion in finding that Delmaro's statements bore none of the "circumstantial guarantees of trustworthiness" necessary to trigger the residual hearsay exception. Fed. R. Evid. 807.

III.

For these reasons, we affirm.